**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**PARKERSBURG**

**STEPHANIE LYNN SATTERFIELD,**

   **Plaintiff,**

**v.**            **CASE NO. 6:11-cv-00826**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

   **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATION**

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Claimant's application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. This case was referred to this United States Magistrate Judge by standing order to consider the pleadings and evidence, and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B).

Plaintiff, Stephanie Lynn Satterfield (hereinafter referred to as "Claimant"), filed an application for SSI on September 15, 2008, alleging disability as of August 31, 2008, due to bipolar, panic attacks, depression, and agoraphobia. (Tr. at 13, 133-40, 160-66, 185-90, 215-20.) The claim was denied initially and upon reconsideration. (Tr. at 13, 76-78, 86-88.) On July 24, 2009, Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 89-90.) The video hearing was held on April 21, 2010 before the Honorable Irma J. Flottman. (Tr. at 32-73, 99, 106.) By decision dated July 27, 2010, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 13-25.) The ALJ's decision

became the final decision of the Commissioner on September 2, 2011, when the Appeals Council denied Claimant's request for review.  (Tr. at 1-5.)  On October 31, 2011, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 1382c(a)(3)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 416.920 (2002).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. § 416.920(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. § 416.920(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.  Id. § 416.920(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 416.920(d).  If it does, the claimant is found disabled and awarded benefits.  Id.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  Id. § 416.920(e).  By satisfying inquiry four, the claimant establishes a prima facie case of disability.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th

Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.  20 C.F.R. § 416.920(f) (2002).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy.  McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she has not engaged in substantial gainful activity since the alleged onset date.  (Tr. at 15.)  Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of mild chronic obstructive pulmonary disease (COPD), residual pain status post fracture to cervical spine, generalized anxiety disorder, panic disorder with agoraphobia, bipolar disorder, and major depressive disorder.  (Tr. at 15-16.)  At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1.  (Tr. at 16-18.)  The ALJ then found that Claimant has a residual functional capacity for light work, reduced by nonexertional limitations.  (Tr. at 18-23.)  The ALJ determined that Claimant has no past relevant work.  (Tr. at 24.)  Nevertheless, the ALJ concluded that Claimant could perform jobs such as order clerk, mail clerk, and shelving clerk which exist in significant numbers in the national economy.  (Tr. at 24-25.)  On this basis, benefits were denied.  (Tr. at 25.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.  In Blalock v. Richardson,

substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was 36 years old at the time of the administrative hearing. (Tr. at 38.) She has a high school education (graduated with a 3.85 grade point average) and two years of college education. (Tr. at 38, 249, 259, 410, 662.) In the past, she worked briefly as a cashier/cook at a fast food restaurant (six weeks) and as a clerk in a tanning bed business (one week). (Tr. at 162.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it below.

<u>Physical Health Evidence</u>

Records indicate Claimant was treated on twenty-six  occasions at Camden Clark Memorial Hospital [CCMH] from July 20, 2004 to December 17, 2009.  (Tr. at 525-635, 686-972, 1010-13, 1016-34.)  Details of these hospital visits are described below chronologically.

On July 20, 2004, Claimant was admitted to CCMH for an injury to her left shoulder. (Tr. at 959.)  Claimant stated she "fell two days ago."  (Tr. at 962.)  Terry C. Shank, M.D., radiologist, found  that three views of the left shoulder showed "[n]o acute fracture...[n]o dislocation...[s]ome degenerative changes and/or sequella from prior trauma is noted about the left acromioclavicular joint."  (Tr. at 972.)

On May 13, 2007, Claimant was admitted to CCMH emergency room [ER] with complaints of breathing difficulties and pain in left side back.  (Tr. at 929.)    Michael Edward Beane, M.D. diagnosed "acute pulmonary emboli" on May 14, 2007.  (Tr. at 933, 1026.)  Claimant was also diagnosed with a 3.7 cm ovarian cyst during a May 14, 2007 CT scan of the abdomen and pelvis in the "right adnexa region" "likely a hemorrhagic cyst". (Tr. at 941, 958.)  On May 16, 2007, a consulting physician, Nik M. Shah, M.D. stated: "In summary, this patient presents with a de novo bilateral pulmonary emboli; the exact source of origin of pulmonary emboli is unknown.  Patient therefore will require at least six months of anticoagulant therapy."  (Tr. at 943.)  Claimant was discharged on May 21, 2007: "She was started on Coumadin and she was discharged to home...in stable and improved condition.  She is to follow-up as an outpatient with Dr. Eric Lowden and Dr. Beane in one to two weeks."  (Tr. at 933.)

On May 25, 2007, Claimant was seen at CCMH for follow-up on her pulmonary

emboli.  (Tr. at 927.)

On May 31, 2007, Claimant was admitted to CCMH with complaints of shortness of breath and pleuritic chest pain.  (Tr. at 913-15, 1018-19.) Claimant was discharged on June 4, 2007.  Id.  Dr. Beane stated:

> a CAT scan revealed the pulmonary arteries to be improved and there was a small to moderate sized left pleural effusion and signs of emphysema and widespread increased interstitial markings with a new very faint _____ at the left lung apex.  Prominent lung abnormality seen at the basal segment of each lower lobe extending into the costophrenic sulci...
>
> Principle Diagnosis
> 486             Pneumonia, organism unspecified
>
> Secondary Diagnosis
> 5119            Unspecified pleural effusion
> 3051            Tobacco use disorder
> V1251           Personal history of venous thrombosis and embolism
> V5861           Long-term (current) use of anticoagulants

(Tr. at 915-16.)

On June 7, 2007, Claimant was seen at CCMH for follow-up on her pulmonary emboli.  (Tr. at 911.)

On June 22, 2007, Claimant was admitted to CCMH with complaints of shortness of breath.  (Tr. at 886, 1027.)  Dr. Beane diagnosed "[o]bstructive chronic bronchitis with (acute) exacerbation."  (Tr. at 889.) It was noted that Claimant "smoked ½ pack a day for 15 years."  (Tr. at 897.)  Claimant was discharged on July 1, 2007.  (Tr. at 888, 1020.)

On July 6, 2007, Claimant was brought to CCMH by her husband  for an evaluation due to her "acute confusion and visual hallucinations."  (Tr. at 875, 1029.) She underwent a CT scan of the head which was negative.  (Tr. at 1021.)  Mark S. Louden, M.D. stated:

> The patient herself is not apparently aware of her abnormal condition.  Her husband states that she has had no trauma, and has not started any new

medications in the last week to 2 weeks.  She was recently admitted to the hospital and treated for pneumonia and pulmonary emboli.  She is on steroids, but these were begun well before her discharge from the hospital on 6/23.  She does not use alcohol or any illegal substances and has not been using any over the counter medications...

DIAGNOSIS: 1.  Hallucinations, 2.  Tachycardia.

DISPOSITION (INCLUDING CONDITION): Condition appears stable.

(Tr. at 875-76.)

On August 21, 2007, Claimant presented to CCMH with complaints of "epigastric and right upper quadrant symptoms that are recurrent associated with nausea and vomiting." (Tr. at 860, 1031.) Robert Rudolph, M.D., diagnosed "chronic cholecystitis" and recommended "outpatient laparoscopy, laparoscopic cholecystectomy utilizing a YAG laser." Id.

On August 29, 2007, Claimant underwent "outpatient laparoscopy, laparoscopic cholecystectomy using YAG laser" at CCMH.  (Tr. at 864.)  Dr. Rudolph stated that Claimant "tolerated the procedure well.  Patient was transferred to recovery room in stable condition."  (Tr. at 865.)

On September 3, 2007, Claimant presented to CCMH with complaints of shortness of breath and fears regarding her history of pulmonary embolus.  (Tr. at 841, 844.)  Michael Dickerson, M.D., stated that Claimant was discharged "in stable, improved, ambulatory condition.  She received discharge prescriptions to include a Xopenex multi dose inhaler along with Zithromax and Phenergan with Codeine."  (Tr. at 845.)  B.O. Garrett, M.D., radiologist, reported a "[n]ormal chest" x-ray, stating: "The heart size is normal.  The lungs are clear.  The costophrenic sulci are unremarkable."  (Tr. at 857.)  W. M. Hensley, M.D., radiologist, compared a CT Chest with Contrast Attention Pulmonary Arteries to a chest

7

exam of June 28, 2007 and concluded:

> 1. The pulmonary arteries and the aorta enhance normally (no pulmonary embolus or dissection is seen).
>
> 2. Diffuse marked abnormality of the lungs is seen. Diminished attenuation is present (moderate emphysema - prominent for a patient this age) and there is a interstitial abnormality with innumerable minute nodules diffusely throughout the lungs, greatest in the upper lobes. These are also evident previously and are of uncertain etiology (could indicate underlying low-grade infection or granulomatous process.
>
> 3. Small linear bands of scarring are seen the right lateral lung base and the lobulated soft tissue density in the left lower lobe, within the costophrenic sulcus, persists but has decreased in size. This is now maximally 1 x 2.4 cm as compared to 1.5 x 3.3 cm on the last exam. Continued follow-up is recommended.
>
> 4. No pleural or pericardial effusion is seen and no pathologic lymphadenopathy is evident.

(Tr. at 856.)

On September 7, 2007, Claimant presented to CCMH for long term anticoagulant treatment. (Tr. at 839.)

On October 26, 2007, Claimant presented to CCMH for deep vein thrombosis testing, which Jeff Moncman, M.D., radiologist, determined was negative: "There is good compressibility and augmentation demonstrated with no evidence of deep vein thrombosis." (Tr. at 838.)

On November 12, 2007, Claimant presented to CCMH with complaints of a panic attack: "She has been drinking alcohol. She wants detox from alcohol." (Tr. at 824.) Notes indicate that Claimant stated "I'd like to kill everybody" and that she was "occasionally, having suicidal thoughts." (Tr. at 826.) Claimant was discharged into the care of her mother. (Tr. at 829.)

On January 28, 2008, Claimant presented to CCMH laboratory for testing regarding her long term use of anticoagulation for a history of pulmonary embolism [PE]. (Tr. at 632-65.)

On February 29, 2008, Claimant presented to CCMH ER with complaints of chest pain. (Tr. at 599, 1023, 1033.) Gary Tucker, M.D. noted: "1. Chest pain that improves with nitroglycerin. 2. History of PE. 3. Tobacco abuse. 4. History of kidney stones. 5. History of anxiety and depression. 5. Emphysema." (Tr. at 610, 1034.)

On February 29, 2008, Terry C. Shank, M.D., radiologist, CCMH, noted a prior chest radiograph on September 3, 2007 and reported that the new chest x-ray showed "no radiographically evidence of active infiltrate and/or failure." (Tr. at 631.)

On March 1, 2008, Dr. Shank, CCMH, made these findings regarding a chest CT:

Prior CT chest is dated 09/03/2007...

IMPRESSION:
1.    No CT evidence of pulmonary emboli detected.
2.    Persistent abnormal appearance of the lung parenchyma with emphysematous changes and multiple nodular structures which are 1 to 2 mm in size are noted throughout both lungs of undetermined etiology. These findings within the lungs are relatively stable.
3.    Interval decrease in size of the prescribed nodular density in the inferior lateral aspect the left lower lobe.

(Tr. at 629-30.)

Records indicate Claimant was treated on eight occasions at Minnie Hamilton Health Systems [MHHS] from May 1, 2008 through October 29, 2008. (Tr. at 262-408, 416-524.) Details of these hospital visits are described below chronologically.

On May 1, 2008, Claimant presented to MHHS with complaints of chest discomfort and palpations. (Tr. at 451.) Records note that Claimant has a history of "Pulmonary

Embolism 2007." Id.  Claimant was diagnosed with "Pancreatitis...discussed need for cessation of Alcohol."  (Tr. at 452.)

On May 2, 2008, Myng S. Kim, M.D., MHHS, noted: "Normal CT examination of the chest.  No evidence of a pulmonary embolus is noted on this examination...Normal CT examination of the abdomen.  Postsurgical change of previous cholecystectomy is noted." (Tr. at 454-55.)

On August 16, 2008, Claimant had a three-day admission to MHHS for "1.  Alcoholic Pancreatisis, 2.  Alcoholic Gastritis, 3.  Alcohol Abuse."  (Tr. at 489.)  On August 19, 2008, Claimant was transferred from MHHS to Chestnut Ridge Hospital for treatment of alcohol abuse and alcohol detoxification.  (Tr. at 255-61.)

On September 5, 2008, Claimant was evaluated at MHHS for nausea and "shaking all over after taking her 'detox pills.'"  (Tr. at 420.)   She was diagnosed with "mild bilat [bilateral] hand tremors" and diagnosed with "anxiety" and "mild withdrawal."  (Tr. at 421.)

On September 21, 2008, Claimant presented to MHHS for a follow-up exam and reported that she "hasn't taken any ETOH [alcohol] for 19 days and has an appointment to see the psychiatrist next week."  (Tr. at 422.)

On October 31, 2008, Claimant presented to CCMH ER with complaints of breathing problems.  (Tr. at 582.)  C. Chambers, M.D., radiologist, made these chest x-ray findings:

> 2 views of the chest to the heart to be stable in size.  A diffuse mildly reticulonodular pattern is again noted.  No focal consolidation, pneumothorax or pleaural effusion is seen.  There is no evidence of failure.
>
> IMPRESSION: 1.  Increased interstitial markings in a reticulonodular pattern is again noted as previously described on CT with no definite acute process seen.

(Tr. at 594.)

On November 24, 2008, Claimant presented to CCMH ER with complaints of trouble breathing and chest pain.  (Tr. at 564.)  A chest x-ray was negative.  (Tr. at 568.)  B. O. Garrett, D. O., radiologist, described Claimant's chest x-rays:

> We have previous studies for comparison dated 10/31/2008...
>
> There has been no significant change in the interval.  The lungs, costophrenic sulci and diaphragm continue to appear normal without infiltrates or inflammatory disease.  The cardiac silhouette and mediastinal contents are within normal limits.  Visualized bone structures appear normal also.
>
> SUMMARY
> 1.  No active disease or change detected.

(Tr. at 579.)

On December 2, 2008, Claimant presented to CCMH ER with complaints of shortness of breath.  (Tr. at 541.)  A CT of the chest was negative for a pulmonary embolism but showed "emphysematous changes."  (Tr. at 545, 557.)  Andrew T. Hughes, D.O., diagnosed bronchitis.  (Tr. at 546.)

On December 17, 2008, Claimant presented to CCMH ER with complaints of "shortness of breath."  (Tr. at 526.)  Donald J. Baker, M.D. noted: "This patient has a history of a prior pulmonary embolism.  The patient has experienced similar episodes in the past.  Patient states [that she] ran out of inhalers."  (Tr. at 528.)  Dr. Garrett, radiologist, described Claimant's chest x-rays:

> PA and lateral views are compared to the prior study of 11/24/2008...
>
> There has been no significant change in the interval.  The lungs, costophrenic sulci and diaphragm continue to appear normal without infiltrates or inflammatory disease.  The cardiac silhouette and mediastinal contents are within normal limits.  Visualized bone structures appear normal also.

SUMMARY
1.  No active disease or change detected.

(Tr. at 538.)

On January 21, 2009, Fulvio Franyutti, M.D. provided a Medical Evaluation/Case Analysis, which stated: "Claimant alleges COPD in ADLs, etc.  PFS [Pulmonary Function Study] will help to set RFC [Residual Functional Capacity] & to establish credibility.  I would obtain it, if it is possible & affordable." (Tr. at 639.)

On February 16, 2009, an evaluator (signature illegible) at Tri-State Occupational Medicine, Inc., provided a Ventilatory Function Report which concluded that Claimant made a "good effort, 4 attempts" and had a "very mild restriction."  (Tr. at 641.)  The evaluator noted that Claimant had no evidence of bronchospasm and that acute respiratory illness was not present.  (Tr. at 642.)

On February 26, 2009, Dr. Franyutti completed a Physical Residual Functional Capacity Assessment [PRFCA].  (Tr. at 643-50.)  Dr. Franyutti concluded that Claimant's primary diagnosis was "[v]ery mild COPD" and that her secondary diagnosis was "[c]hr. [chronic] alcoholism & abdominal pain syndrome." (Tr. at 643.)  He opined that Claimant could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday, sit (with normal breaks) for a total of about 6 hours in an 8-hour workday, and push and/or pull (including operation of hand and/or foot controls) unlimited, other than as shown for lift and/or carry.  (Tr. at 644.)  He opined that Claimant had no postural, manipulative, visual, or communicative limitations.  (Tr. at 645-47.)  He marked that she was unlimited in the environmental areas of wetness, humidity and noise but should avoid concentrated

12

exposure to extreme temperatures, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards.  (Tr. at 647.)  Dr. Franyutti concluded: "ADLs are independent from a physical standpoint.  Claimant is partially credible."  (Tr. at 648.)

On April 4, 2009, Claimant presented to CCMH with complaints of shortness of breath and chest pain.  (Tr. at 697.)  Claimant was administered Toradol 30 mg, Zofran 4 mg, Levofloxacin 500 mg, and discharged on April 5, 2009.  (Tr. at 703-04.)

On April 20, 2009, Claimant presented to CCMH with complaints of shortness of breath and chest pain.  (Tr. at 686.)  Claimant was administered Albuterol 1.25 mg, Toradol 60 mg and discharged.  (Tr. at 693.)  Terry C. Shank, M.D., radiologist, stated that a chest CT with contrast utilizing pulmonary emboli protocol showed no  evidence of pulmonary emboli.  (Tr. at 708.)

On May 21, 2009, Jason Barton, D.O., Good Samaritan Clinic, treated Claimant.  Dr. Barton stated:

> 35-year-old female with multiple medical problems, including past history of PE status post lobectomy.  She has had a fairly complicated last couple of years, especially the last few months.  She has been going to the ER with what appears to be asthma exacerbations and chest tightness that responds to bronchodilators.  She does not have a prescription for home nebulizer treatments.  She uses Symbicort with very little relief.  Also of note, while in the ER at her visits, she has been having a progressively and persistently elevated white blood cell count...She denies any lymph node enlargement, weight loss, or overwhelming fatigue however...
>
> Will go ahead and repeat her CBC, get a sed rate, ANA, and rheumatoid factor, leukocyte, alkaline phosphatase, and viral hepatitis panel.  If white blood cell count remains elevated, she will likely need bone marrow biopsy. I will get a CT of the abdomen and pelvis...return in one month for further evaluation and to review the current workup with the next months physician.

(Tr. at 990.)

On June 2, 2009, Neil R. Strobl, M.D., Saint Joseph Hospital, reviewed a CT

13

abdomen and CT pelvis, both with contrast, per the request of Jason Barton, D.O., Good

Samaritan Clinic.  He concluded:

> Review of the lung bases shows mild bibasilar fibrosis suggesting chronic cigarette smoking.  There is bibasilar atelectasis and scarring.

> Within the abdomen, the liver appears normal in size and contour.  There are no focal hepatic lesions.  The gallbladder has been surgically removed.  The spleen, pancreas, and adrenal glands appear normal.  Both kidneys show normal contrast enhancement.  There are no renal masses.

> Review of the bowel shows no evidence of obstruction.  There is no focal bowel wall thickening or intra-abdominal inflammation.  The appendix is normal.  Within the pelvis, the uterus and ovaries appear grossly normal.  There are bilateral ovarian follicles including a 1.5 cm dominant, enhancing follicle on the left.  No free fluid is seen.  There are no large cystic masses.  The bladder appears normal.

> Impression:
> 1.  Mild bibasilar fibrosis suggesting chronic cigarette smoking.  There is atelectasis and scarring in both lower lobes.
> 2.  Bilateral ovarian follicles including an enhancing 1.5 cm dominant follicle on the left.
> 3.  Status post cholecystectomy.
> 4.  Otherwise, unremarkable CT scan of the abdomen and pelvis.  No acute intra-abdominal inflammation is seen.  The pancreas appears normal.

(Tr. at 977, 996.)

On June 17, 2009, a State agency medical source completed a Case Analysis.  The

evaluator, Philip E. Comer, Ph.D., concluded: "I have reviewed evidence in file and

assessment of 04/07/09 is affirmed as written."   (Tr. at 979.)

On June 18, 2009, Claimant was treated at Good Samaritan Clinic.  Progress notes

state:

> Ms. Satterfield is here for evaluation of workup for abdominal pain, which included a CAT scan of her abdomen and pelvis, which was essentially normal except for some bibasilar fibrosis of the lungs, and she still is smoking cigarettes.  The rest of her labs looked good with a negative ANA, negative rheumatoid factor ANA, negative Hepatitis A, B, and C, normal white count,

normal hemoglobin, normal sed rate, normal blood sugar, kidney test, and amylase and lipase.

EXAM: BP 140/76.   Really her abdominal exam is benign, except for moderate tenderness of the epigastrium, suggestive of gastritis.

ASSESSMENT:
1.  Epigastric pain, probably related to GERD and gastritis.

PLAN: Stop smoking, particularly given her GERD and her asthma.

(Tr. at 989.)

On June 18, 2009, a State agency medical source completed a Physical Residual Functional Capacity Assessment [PRFCA]. (Tr. at 980-87.) The evaluator, Atiya M. Lateef, M.D., stated that Claimant's primary diagnosis was "mild COPD", her secondary diagnosis was "h/o [history of] pancreatitis" and her other alleged impairments were "h/o alcohol abuse, h/o pulmonary embolus."  (Tr. at 980.)  Dr. Lateef opined that Claimant could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday, and sit (with normal breaks) for a total of about 6 hours in an 8-hour workday, and had an unlimited ability to push and/or pull (including operation of hand and/or foot controls), other than as shown for lift and/or carry.  (Tr. at 981.)  Dr. Lateef concluded that Claimant could perform all postural limitations frequently, save for balancing which could be done occasionally, and climbing ladder/rope/scaffolds and balancing at heights, which Claimant could not do.  (Tr. at 982.)  Claimant was determined to have no manipulative, visual or communicative limitations.  (Tr. at 983-84.)  Regarding environmental limitations, Dr. Lateef found Claimant was unlimited except that she should avoid concentrated exposure to extreme temperatures and fumes, odors, dusts, gases, poor ventilation, etc. and should

avoid all exposure to hazards.  (Tr. at 984.) Dr. Lateef concluded: "RFC reduced to medium with environmental and postural limitations as mentioned."  (Tr. at 987.)

On December 6, 2009, records indicate Claimant visited Coplin Memorial Health Clinic to "[g]et established, medication…smoker…[g]oes to Westbrook." (Tr. at 999, 1037.)

On December 17, 2009, Claimant presented to CCMH ER following a motor vehicle accident.  (Tr. at 1000-13.)  Dr. Garrett, radiologist stated that a CT scan of the head revealed no abnormalities or fracture.  (Tr. at 1005, 1012.)  A CT scan of the cervical spine showed "some minor avulsion fractures from the anterior superior cortex of the body of C5…normal alignment posteriorly…normal relationship of the atlas to axis."  (Tr. at 1006, 1013, 1044-45.)  X-rays of the pelvis, left hip, left shoulder, right lower leg, left lower leg and chest were negative.  (Tr. at 1007-08, 1010-11, 1041-43.)

On December 29, 2009, Rammy S. Gold, M.D. reviewed AP and lateral cervical spine films and concluded: "The patient has a small anterosuperior chip of the C5 body.  There is a question of a fracture of the transverse process of C7 and of the T2 rib on the left.  Alignment of the vertebral bodies, however, is anatomic.  Nevertheless, subluxation is appreciated." (Tr. at 1054.)

On December 29, 2009, M. P. Cowdery, FNP [Family Nurse Practitioner], PARS Neurosurgical Associates, Inc., stated:

> At this time Dr. Gold has reviewed the findings of the CT and x-rays with the patient.  He has told her that he recommends that she continue her Miami J collar.  We will see her back in clinic in 2 weeks with AP/LAT c-spine x-rays.  If at that time the x-rays are stable we will obtain flexion/extension c-spine x-rays and if they are stable we will start her in a soft collar and see her in 1 month.

(Tr. at 1053.)

On February 18, 2010, Tobie S. Newberry, FNP, PARS Neurosurgical Associates, Inc., stated: "At this time we have reviewed the most recent x-rays and compared them to the x-rays on 1/13/10.  Her x-rays appear stable.  She is able to wean herself from her soft collar over the next week.  She will follow up in our office on an as needed basis."  (Tr. at 1066.)

On March 1, 2010, records indicate Claimant was treated at Coplin Memorial Health Clinic for a "3 month f/u [follow-up]."  (Tr. at 1035.)  She was diagnosed with COPD and neck pain. (Tr. at 1036.)

<u>Mental Health Evidence</u>

On October 11, 2007, Maida Sierra, M.D., Worthington Center Psychiatric, completed a comprehensive psychiatric evaluation of Claimant.  (Tr. at 248-50.)  Dr. Sierra stated:

> Ms. Satterfield is a married Caucasian female who gives a long history of Agoraphobia.  She has a fear of leaving the house and cannot be in crowded places because "I go into a panic."  Her husband is disabled, but he has to do all the grocery shopping because she will not go into a store.  She reports that her husband became disabled and they had to leave their home.  They have since moved in with her parents and live in their basement...
>
> The patient started drinking when she was 14.  She currently drinks 12 to 16 beers a day.  She denies any history of drug use.  She smokes half a pack of cigarettes a day and drinks two pots of coffee every morning...
>
> She and her husband have been married twice and have been together a total of 14 years.  They have two children, a boy age 13 and a girl age 11.  She worked for six weeks at one time but then became pregnant with her daughter and quit working...
>
> **MENTAL STATUS EXAMINATION**: The patient was clean and casually dressed appropriate to the weather.  She had normal gait with no evidence of deformities.  She was pleasant and cooperative.  She maintained good eye contact.  Her speech was of normal rate and volume.  Thought processes were relevant and coherent with no evidence of delusions.  She denied any

17

hallucinations. Mood and affect were of sadness and depression with crying spells, feelings of hopelessness and low self-esteem. She denied having any suicidal thoughts or thoughts of hurting others. She was oriented to person, place and time. Attention and concentration were fair. Memory was adequate for past and recent events. She could recall three out of three words immediately and three out of three words in ten minutes. She could give information about her childhood including her elementary school and the name of her second grade teacher. She could name the president and two immediate prior presidents. She had a digit span of five and a reverse digit span of four. She could repeat a seven digit telephone number. She was able to interpret similarities appropriately. Her proverb interpretation of people who live in glass houses was "not to talk bad about people and says things that are not true. She had difficulty with serial subtractions of 7 from 100. Her answers were 93 and 86 but could not proceed. She then started to get nervous and tearful. The patient has some insight into her need for treatment. Her judgment is fair.

**DIAGNOSTIC IMPRESSION**:
**AXIS I:**     296.3.2 Major Depression, Recurrent, Moderate
                300.02 Generalized Anxiety Disorder
                305.00 Alcohol Abuse
AXIS II:      Deferred
AXIS III:    History of lung blood clots
AXIS IV:    Psychosocial Stressors: Moderate (financial problems, losing her home, unemployment)
AXIS V:     Current GAF: 55...

**ASSESSMENT**: The patient is presenting with a long history of Agoraphobia and symptoms of depression and a prior episode of depression. She also has considerable anxiety secondary to her stressors. I discussed the role of medication and recommended therapy with Cymbalta and short-term use of Klonopin. I explained that Klonopin was contraindicated with alcohol and advised the patient to abstain from drinking any alcoholic beverages. We also discussed ways to taper off her caffeine intake. I also recommended counseling, and she agreed...Return to clinic within one month.

(Tr. at 248-50.)

On October 25, 2007, a progress note from Worthington Center Psychiatric states:

"Moods are better with Cymbalta. Still feels like she has no energy...Tobacco ½ ppd [packs per day]...8 beers X [per] day...3 cups coffee/day...drinking less." (Tr. at 251.)

On August 19, 2008, Claimant was transferred to Chestnut Ridge Hospital from

Minnie Hamilton Health System for treatment for alcohol abuse and for alcohol

detoxification.  (Tr. at 255-61.)  The intake report states:

> She was admitted to another hospital on Saturday as she was spitting up
> some blood.  She was recently diagnosed with acute pancreatitis.  The patient
> stated that she has been having some flare ups of pancreatitis but this was the
> first painful episode she had and that is when she decided that she wants to
> get detox and give up drinking.  The patient admits going to AA meetings 5
> years ago.  The patient is not sure exactly when her last drink was, she thinks
> it was either Saturday morning or Friday night…The patient has had 2 psych
> inpatient hospitalizations.

(Tr. at 258.)

On August 22, 2008, Claimant was discharged from Chestnut Ridge Hospital.  (Tr.

at 256.)  Richard Mullin, M.D. stated in the discharge summary:

> DISCHARGE DIAGNOSES:
> Axis I:       Alcohol dependence.  Nicotine dependence.  Mood disorder,
>               not otherwise specified.
> Axis II:      None.
> Axis III:     Recent  pancreatitis,  history  of  pulmonary  embolism,
>               emphysema.
> Axis IV:      History of substance dependence, medical stressors, poor
>               coping skills, social stressors.
> Axis V:       Global Assessment of Functioning: Admission GAF 31-40,
>               discharge GAF 60-65.
>                              *      *      *
> DISCHARGE MENTAL STATUS EXAMINATION: The patient is alert and
> oriented X4.  She is well groomed and appears her stated age.  Her mood is
> happy and her affect is congruent with mood as she smiles and laughs
> frequently.  Her thought process is logical and goal directed.  Thought
> content contains no hallucinations, delusions or preoccupations. She denies
> any suicidal or homicidal ideation.  She exhibits good insight and good
> judgment.
>                              *      *      *
> REASON FOR HOSPITALIZATION AND HOSPITAL COURSE: …She was
> admitted from Minnie Hamilton Health Systems for alcohol detoxification.
> She was admitted there for acute pancreatitis secondary to drinking and was
> stabilized medically there before being transferred her to Chestnut Ridge
> Hospital.  We discontinued her Cymbalta as her mood and anxiety problems
> appeared to be related to her drinking.  She was educated on how her mood
> and anxiety problems were probably caused by the drinking and that when

19

she is sober for about 4 weeks, these problems should resolve.  If she continues to have problems with anxiety and depression after being off alcohol and other substances, she may need to go back to some sort of antidepressant in the future.  She was started on an Ativan taper which she tolerated well.  She will be continued on the remaining taper as an outpatient. She attended NA and AA meetings and got a desire chip.  She also reports a desire to quit smoking and therefore was given a nicotine patch script so she can continue with nicotine replacement upon discharge.  She will continue AA meetings upon discharge...She recognized the potential pitfalls of not staying busy and not going to meetings.  She plans on becoming more active and getting involved with AA meetings in the Parkersburg area.  She was stable for discharge.

(Tr. at 256-57.)

On September 22, 2008, Lily Jacob, M.D., Westbrook Health Services, stated:

Patient came in for medication follow up after her recent discharge from West Virginia University Hospital...

Patient was asked to fill out the mood disorder questionnaire and patient has some form of mood disorder and was recommended to start Abilify and patient is agreeable.  Due to her depression patient wants to be started on an antidepressant.  No other problems voiced today...

**PLANS**: Will continue the Campral medication but will discontinue the Antabuse inasmuch that the patient doesn't want to take the medication.  Will start her on Cymbalta and Abilify and patient is agreeable to try.  Follow up in two weeks.

(Tr. at 412, 660.)

On October 6, 2008, Dr. Jacob stated:

Patient came in for a two week med check...Patient was just recently started on Abilify and Cymbalta medication.  Stated that she is happier now and not having mood swings.  No more anger problems noted and is not easily getting agitated.  Patient, however, reported that she has not been sleeping well because she is getting too anxious...Patient continues to be sober.  Reported Cymbalta medication helped her not to have the urge to drink alcohol. Patient reported no mood swings at this time.  Recommended to try Lunesta to help her sleep and patient is agreeable.  No other problems voiced.  Patient stated that she is no longer feeling depressed.

(Tr. at 413, 659.)

On October 10, 2008, Nohl Braun, M.D., Westbrook Health Services, Process Strategies Outpatient Clinic, provided a telepsychiatry comprehensive psychiatric evaluation wherein he concluded:

CHIEF COMPLAINT:
"Anxiety"

\*        \*        \*

SUBSTANCE ABUSE HISTORY:
Reports alcohol was a problem she used to drink eighteen beers a day went in detox at Chestnut Ridge 08-19-08 for three days and has been Campral since then doing well.  No other substance problems.

\*        \*        \*

MENTAL STATUS EXAMINATION:
Seen was a thirty-eight-year-old female dressed in casual clothes, reasonably clean, moderate length hair with wire rimmed glasses, tearful most of the interview, very anxious and announced that although her mood is "Pretty good" very anxious, tearful, dabbed the tears away with tissues and sat stiffly, not suicidal, not homicidal at this time.  No paranoia, no hallucinations, has OC symptoms has to have things perfectly arranged she does do some checking; works about three hours on cleaning the house everyday, some of this appears to be due to the severe agoraphobia however keeping her at home all the time.  Alert and oriented X3 with concrete thinking, good judgment, good insight to test; question judgment and insight elsewhere. Serial 3's 5/5.  Speech is goal directed to the point.  Judged to be of average/above average intelligence based on the history and mental status examination.

FORMULATION:
This is a thirty-eight-year-old female who comes in with symptoms consistent with bipolar II disorder, panic attacks with very severe agoraphobia, generalized anxiety disorder, and alcohol dependence in early total remission per history.  She's agreeable to treatment as noted below with the meds and continue in therapy.

(Tr. at 409-11.)

On November 7, 2008, Dr. Braun evaluated Claimant and reported:

Patient presented today, not suicidal, not homicidal.  No acute reactions or side effects to meds.  Reports she's having all low days a week thus will

increase Cymbalta will start on samples as she originally reduced the dose to 60 mg because she was unable to pay.   We are going to increase the Clonazepam as she's continuing to have panic attacks and the patient agrees to go to therapy for this.

(Tr. at 414, 657.)

On December 5, 2008, Dr. Braun evaluated Claimant and reported:

DIAGNOSES:
Bipolar II Disorder
Panic Attacks with Severe Agoraphobia
Generalized Anxiety Disorder
Alcohol Dependence in Early Total Remission...

No acute reactions or side effects to meds.  Said that mood swings continue every three hours thus will increase the Abilify.  The Clonazepan is helping with anxiety but not fully thus will increase this as well.  Still depressed she reports on a steady basis thus will go to Cymbalta 120 mg a day...cooperative appears cheerful at this point.

(Tr. at 637, 656.)

On January 9, 2009, Dr. Braun stated: "Said she's bipolar and the anxiety is under control and thus will forward to the PA [physician's assistant] per agreement...euthymic, broad affect, no frank anxiety.  Assessment:  Good progress on meds."  (Tr. at 636, 654.)

On February 5, 2009, Amanda Flesher, PA-C [Physicians Assistant - Certified], Westbrook Health Services, stated: "Patient presents in a pleasant mood today.  She reports that she has been doing well.   Currently denies any feelings of depression or anxiety...Currently, patient is stable so current medication will be continued...Will follow up with me in one month." (Tr. at 651, 973.)

On March 5, 2009, Ms. Flesher, PA-C, Westbrook Health Services, stated: "Patient presents in a pleasant mood today.   Patient denies any feelings of depression or anxiety...Currently, patient is stable so current medication will be continued...Will follow

up with me in one month." (Tr. at 652, 974.)

On April 2, 2009, Ms. Flesher, PA-C, Westbrook Health Services, stated:

Stephanie presents for a routine monthly medication check...Patient presents today reporting that she drank approximately one month ago. She had about three drinks and then she stopped. Patient denies feeling depressed or anxious today. She is not manic, not psychotic, not suicidal or homicidal. She has been taking her medication as prescribed with no adverse effects. No other concerns or complaints today.

(Tr. at 653, 975.)

On April 4, 2009, a State agency medical source provided an Adult Mental Status Evaluation Consultative Report. (Tr. at 661-67.) The evaluator, Paul A. Dunn, Ph. D., noted that Claimant has been married twice and has two children (ages 14 and 12) from the first marriage who do not live with her. (Tr. at 662, 665.)   Dr. Dunn concluded:

LEGAL HISTORY: She said she has been arrested once for domestic violence, having punched her husband in the face.
TRAUMA HISTORY/ABUSE: She said she was molested at 14 years of age by her brother-in-law.

SUICIDAL OR SELF-INJURIOUS BEHAVIOR/IDEATION: She said that she attempted suicide in 2007 by taking 11 Benadryl, but she just slept for five or six hours and she did not seek out any medical attention nor receive any.

MENTAL STATUS EXAMINATION: Behavior: Her motor activity was within the average range. There was no agitation or psychomotor retardation. Emotional State: Facies: She was smiling at times, and at other times seemed to be somewhat anxious. Affect was anxious. Mood anxious. Attitude: Average; she was cooperative in the evaluation. She exhibited an average level of appropriately focused eye contact in the evaluation. Speech: Clear, coherent, of average volume, tone, rhythm, and below average fluency. Orientation: She was well oriented to person, place, time, and basically to circumstance. Thought Process/Content: The claimant's stream of thought was fairly relevant, logical, and adequately organized. She had no particular preoccupations other than talking about her fear of leaving the house because of panic attacks. Perceptual: The claimant does not exhibit any perceptual disturbance in the exam, nor endorse any history of auditory or visual hallucinations. Concentration: Within normal limits, based on the claimant obtaining a scaled score of 5 on the Comprehension subtest of the WAIS-IV.

23

<u>Immediate Memory</u>: Within normal limits, based on the claimant recalling four of four words immediately after they were presented. <u>Recent Memory</u>: Within normal limits, based on the claimant recalling four of four words after a 15-minute delay. <u>Remote Memory</u>: Within normal limits, as evidenced by the claimant's ability to recall personal historical data without difficulty. <u>Judgement</u>: Moderately deficient, based on the claimant obtained a scaled score of 5 on the Comprehension subtest of the WAIS-IV. <u>Persistence</u>: Within normal limits, based on observation of the claimant's ability to stay on tasks, and make consistent effort during the exam. <u>Pace</u>: Mildly deficient, based on observation of the claimant's below average pace during the objective testing.

<u>SOCIAL FUNCTIONING</u>: <u>During the Evaluation</u>: Social functioning was mildly deficient during the evaluation. The claimant made intermittent, appropriately focused eye contact, engaged in some conversation, and displayed appropriate social graces in general. <u>Self-Reported</u>: She states that there is very little social life that she has. She lives with her parents. She goes out with them to eat on a rarely occasional basis. She visits her children. She takes her children to drop off at Wal-Mart with money. She said she goes with her son fishing on rare occasions. She watches TV with her family. She plays on the computer and makes meals for her children.

<u>DAILY ACTIVITIES</u>: She gets up at 6:30, gets her medications, watches the news, watches Maury on TV. She showers and dresses, she cleans up. She mostly watches TV the rest of the day.

<u>DIAGNOSTIC IMPRESSION</u>:

| Axis I | 300.21 | Panic Disorder with Agoraphobia. |
| | | Generalized Anxiety Disorder. |
| Axis II | V71.09 | No Diagnosis. |
| Axis III | V71.09 | No Diagnosis. |

<u>DIAGNOSTIC RATIONALE</u>: The diagnosis of Panic Disorder with Agoraphobia is due to the frequency of her panic attacks, and them keeping her from leaving the home. She does have Generalized Anxiety Disorder that is expressed in the exam itself, and she did have a very mild panic attack in the session and was anxious throughout the session. She gives a number of different symptoms and has a sleep disorder in addition. Her symptoms are controlled with medication at this time as long as she stays at home.

<u>PROGNOSIS</u>: Fair since she is in therapy currently.

<u>CAPABILITY</u>: The claimant is capable of managing her funds, should they be awarded to her.

(Tr. at 664-65.)

On April 7, 2009, a State agency medical source completed a Psychiatric Review Technique form. (Tr. at 672-85.) The evaluator, Joseph Kuzniar, Ed.D., concluded that it was necessary to complete a Mental Residual Functional Capacity Assessment [MRFCA] to evaluate Claimant's affective and anxiety related disorders. (Tr. at 672.) He marked that Claimant had a moderate degree of limitation in restriction of activities of daily living, difficulties in maintaining social functioning, concentration, persistence or pace, and "one or two" episodes of decompensation, each of extended duration. (Tr. at 682.) He found that evidence does not establish the presence of the "C" criteria of the listings. (Tr. at 683.) Dr. Kuzniar concluded: "Acceptable credibility as indicated as the AFR was generally consistent with the MER. (Tr. at 684.)

On April 7, 2009, Dr. Kuzniar completed a MRFCA. (Tr. at 668-71.) He marked that Claimant was "not significantly limited" in the ability to remember locations and work-like procedures; to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to accept instructions and respond appropriately to criticism from supervisors; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; to set realistic goals or make plans independently of others. He marked that Claimant was "moderately limited" in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to work in coordination with or proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact

appropriately with the general public; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; to respond appropriately to changes in the work setting. He marked that Claimant was "markedly limited" in the ability to travel in unfamiliar places or use public transportation. He marked that there was "no evidence of limitation" in Claimant's ability to understand and remember very short and simple instructions; to carry out very short and simple instructions; to sustain an ordinary routine without special supervision; to make simple work-related decisions; to ask simple questions or request assistance; to be aware of normal hazards and take appropriate precautions. (Tr. at 668-69.)  Dr. Kuzniar concluded:

> The claimant retains the capacity to carry out at least 1-3 step routine repetitive instructions.  The claimant reports not being able to leave the house alone and becoming anxious in crowds and around large number of family members.  During the CE [clinical evaluation], she exhibited some anxiety and she reported being able to keep appts [appointments] and to attend AA [Alcoholics Anonymous] meetings.  If transported to a work setting, she retains the capacity to manage minimal contact with the general public, coworkers and supervisors.  She can best work with things instead of people.  She retains the capacity to manage a low pressured work setting with constant job duties and very little decision making.

(Tr. at 670.)

On April 30, 2009, Ms. Flesher, PA-C, Westbrook Health Services, stated: "Patient reports some continued mood instability today.  This has been going on for approximately 1 month.  Patient does have daily bouts of where she feels depressed, but then she will feel happy...Patient will begin Lamictal to target symptoms of Bipolar...Will follow up with me in one month."  (Tr. at 976.)

On June 22, 2009, a State agency medical source completed a Case Analysis.  The evaluator, Philip E. Comer, Ph.D., concluded: "Late arriving MER [medical evidence of

record] from Westbrook does not change assessment."  (Tr. at 998.)

On January 12, 2010, Ms. Flesher, Westbrook Health Services, stated:

The patient presents to today's visit reporting that she has been continuing to have problems sleeping.  This has been going on for about six weeks.  About a month ago, she was involved in a car accident and broke her neck.  However, she is recovering from that slowly, and she says that the sleep problems began before this happened...To help the patient with sleep, we will increase the trazodone to 200 mg qhs [*quaque hora somni*, every bedtime].

(Tr. at 1048.)

On February 18, 2010, Ms. Flesher, Westbrook Health Services, stated: "The patient reports that she has been having some increased mood instability recently...Due to patient's continued mood instability, we will increase the Lamictal to 250 mg and then 300 mg q.d. [*quaque die*, daily]..Will follow up with me in one month."  (Tr. at 1046.)

On May 19, 2010, Ms. Flesher, PAC, Westbrook Health Services, completed a Mental Assessment of Ability to Do Work-Related Activities form.  (Tr. at 1080-82.)  She marked that Claimant had no impairment in her ability to "maintain personal appearance".  (Tr. at 1082.)  She marked that Claimant had a "slight" or "mild limitations" in her ability to follow work rules; function independently; understand, remember and carry out simple job instructions; and behave in an emotionally stable manner.  (Tr. at 1081-82.)  She marked that Claimant had "moderate" limitations in her ability to relate to coworkers; deal with the public; use judgment; interact with supervisors; maintain attention/concentration; understand, remember and carry out detailed, but not complex job instructions; and relate predictably in social situations.  Id.  She marked that Claimant had "marked" limitations in her ability to deal with work stressors; understand, remember and carry out complex job instructions; and ability to complete a normal work day and work week without

27

interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Id.  Ms. Flesher noted: "Patient has anxiety which impairs concentration and social interaction. Anxiety would cause decreased concentration." (Tr. at 1081.) She further noted: "Due to anxiety and mood instability, the ability to complete normal work activity would be impaired.  Mood instability/anxiety affect interpersonal/ social interactions." (Tr. at 1082.)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because (1) the ALJ failed to give adequate weight to the opinion of Claimant's treating mental health professional, Dr. Nohl Braun; and (2) failed to comply with SSR 96-8p in assessing Claimant's residual functional capacity [RFC].  (Pl.'s Br. at 2-6.)

The Commissioner's Response

The Commissioner asserts that the ALJ's decision is supported by substantial evidence because (1) two State agency psychologists found Claimant remained capable of sustained work activity and Dr. Braun, the treating psychiatrist, did not offer any disability opinion in this case; and (2) the ALJ properly assessed Claimant's RFC in a thorough analysis, which included a discussion of Claimant's credibility.  (Def.'s Br. at 14-20.)

Analysis

Weighing Medical Opinions

Claimant first argues that the ALJ failed to give adequate weight to the opinion of Claimant's treating mental health professional.  (Pl.'s Br. at 2.)  Specifically, Claimant asserts:

The Plaintiff's treating physician, Dr. Nohl Braun, completed a psychiatric

28

evaluation on October 10, 2008, which indicated that the claimant had very severe agoraphobia that caused automatic panic attacks when she left her house (Transcript pg. 411). Dr. Braun diagnosed the Plaintiff with Bipolar II Disorder, Panic Attacks with Very Severe Agoraphobia, Generalized Anxiety Disorder, Alcohol Dependence in Early Total Remission (Transcript pg. 411).

Dr. Braun's treatment notes support the Plaintiff's diagnoses; the Plaintiff consistently reports depression and anxiety (Transcript pg. 412). The ALJ stated, "on October 6, 2008, the claimant reported that she was happier and no longer had mood swings or anger problems" (Transcript pg. 413). However, in the same treatment note, Dr. Braun also noted "patient, however, reported that she has not been sleeping well because she is getting too anxious" (Transcript pg. 413). On November 7, 2008, the Plaintiff reported having all low days in the week and having increased panic attacks. Dr. Braun responded by increasing her depression and anxiety medications (Transcript pg. 414). Again on December 5, 2008, the Plaintiff reported continued mood swings and some residual anxiety and depression, which led to further medication changes (Transcript pg. 637). The ALJ stated, "On January 9, 2009, Dr. Braun noted that the claimant appeared cheerful and had no frank anxiety. In fact, the claimant reported that her anxiety was under control" (Transcript pg. 20). However, after a thorough review of the treatment note located on page 636 of the Transcript, although the Plaintiff did report that her anxiety was under control, Dr. Braun did not note that the Plaintiff was cheerful.

On April 4, 2009, the claimant attended a consultative examination where the Plaintiff was diagnosed with Panic Disorder with Agoraphobia and Generalized Anxiety Disorder (Transcript pg. 665). The ALJ noted, "However, the claimant indicated that her panic attacks have been well controlled as long as she stays in her house" (Transcript pg. 20). The fact that the Plaintiff's panic attacks are well controlled as long as she stays in her house is not evidence that her anxiety is under control. In fact, it is exactly the opposite; if the Plaintiff's panic attacks occur when she leaves the home, she would certainly be unable to maintain the attention and concentration required to complete a workday.

The ALJ purposely chose which portions of the treatment notes to cite in her decision, and ignored portions that supported Dr. Braun's opinion and diagnoses. By doing so, the ALJ erred in failing to accord adequate weight to the Plaintiff's treating physician.

(Pl.'s Br. at 3-4.)

The Commissioner responds that the ALJ's decision is supported by substantial

evidence and contrary to Claimant's assertions, Dr. Braun, the treating psychiatrist, did not

offer any disability opinion in this case.   (Def.'s Br. at 14, 17.)   Specifically, the

Commissioner asserts:

> Substantial evidence in the record, including the reports of two state agency psychologists who reviewed the record and found that Plaintiff remained capable of sustained work activities with certain limitations on social interactions, stress, and complexity (Tr. 668, 979, 998), supported the ALJ's conclusion that Plaintiff remained capable of a limited range of work.  The ALJ adopted Dr. Kuzniar's assessment of Plaintiff's mental capacity verbatim after finding Dr. Kuzniar's assessment consistent with the record as a whole (Tr. 18, 22)...

> The ALJ's decision also enjoyed the support of the mental health treatment records, which the ALJ explained showed the "effectiveness of the claimant's medication" and an absence of psychiatric hospitalizations (Tr. 21).  The ALJ was persuaded that Plaintiff's repeatedly normal mental status examinations as well as her course of stability with only occasional exacerbations showed that her condition was "not as severe as alleged" (Tr. 21).  Dr. Braun, for example, found Plaintiff "cheerful" shortly after he initiated treatment, with no frank anxiety, and even Plaintiff reported that her anxiety was under control (Tr. 20, 636-37).

> On top of all this evidence, the ALJ decision was further supported by Plaintiff's activities, which the ALJ appropriately found inconsistent with Plaintiff's claims of disabling panic attacks from agoraphobia (Tr. 22)...

> The law is clear that it is the ALJ who, based on her consideration of the entire record, makes the ultimate finding of the credibility of Plaintiff's subjective complaints...

> Against this strong factual record supporting the ALJ's decision, Plaintiff offers few counter-arguments.  She contends that the ALJ was required to accept a disability opinion from Dr. Braun, but Dr. Braun did not offer any disability opinion in this case.  To the extent Plaintiff is arguing that the ALJ was compelled to accept Dr. Braun's diagnoses (bipolar disorder, panic attacks with very severe agoraphobia, generalized anxiety disorder), in fact, the ALJ did so (Tr. 18).  The ALJ simply did not find - and Dr. Braun never so opined - that the functional limitations from those conditions were preclusive of all work, which is the ultimate issue in the disability analysis...

> Plaintiff also quibbles with the ALJ's discussion of Dr. Braun's treatment records.  Plaintiff points out (Pl. Br. at 3) that the ALJ erred in citing a

January 9, 2009 treatment note stating that Plaintiff was "cheerful" (Tr. 20, 636). But the only "error" committed by the ALJ was in reciting the date of that treatment note; in fact, Dr. Braun made the note that Plaintiff appeared "cheerful" even earlier in his treatment of Plaintiff. It was at their third session (not their fourth session), in December 2008, that Dr. Braun recorded that Plaintiff "appear[ed] cheerful" (Tr. 637). Needless to say, such an "error" is entirely inconsequential.

Plaintiff also misreads the ALJ's decision when she addresses the ALJ's statement that "'the claimant indicated that her panic attacks have been well controlled as long as she stays in her house'" (Pl. Br. at 4, citing Tr. 20). That was not a finding by the ALJ, but rather a recitation of Plaintiff's statement to Dr. Dunn (Tr. 20, 665-66). Dr. Dunn understood from Plaintiff that her panic attacks kept her from leaving her home (Tr. 665). But the fuller record demonstrated to the ALJ's satisfaction that Plaintiff overstated the limiting effects of her impairments, as already discussed at length above.

(Def.'s Br. at 14-19.)

The Commissioner makes these assertions regarding the opinion evidence of Ms. Flesher:

The one disability opinion in the record is signed by Ms. Flesher, who is not an acceptable medical source under governing regulations. See 20 C.F.R. § § 416.913(1), 927(a). In any event, as the ALJ found, Ms. Flesher's statement deviated significantly from treatment records, thus undercutting the weight to which it was entitled under the regulations. See 20 C.F.R. §§ 416.927(d)(f). The ALJ explained that treatment records demonstrated a good response to medications, with normal mental status examinations and few exacerbations after treatment (Tr. 21)...The ALJ also noted that Ms. Flesher's statement was largely based on Plaintiff's self-reported symptoms rather than her own clinical findings (Tr. 23), which is yet a further appropriate reason for an ALJ to discount a treating source opinion under the regulations.

(Def.'s Br. at 17, footnote 5.)

The ALJ made very thorough findings in her 13-page decision of July 27, 2010 regarding the medical evidence of record, including extensive findings regarding the opinions of treating psychiatrist, Dr. Braun, as well as the opinions of consultative examiners and other mental health professionals. (Tr. at 13-25.) The ALJ found:

The record revealed a history of generalized anxiety disorder, panic disorder with agoraphobia, bipolar disorder, and major depressive disorder.  A psychiatric evaluation report from Dr. Nohl Braun, dated October 10, 2008, indicated that the claimant had very severe agoraphobia that caused automatic panic attacks when she left her house.  He noted the claimant reported that she worried a lot and suffered from bipolar disorder.  Accordingly, Dr. Braun diagnosed bipolar disorder, panic attacks with severe agoraphobia, and generalized anxiety disorder based upon the claimant's complaints and symptoms (Exhibit 4F).  On April 4, 2009, consultative examiner, Paul Dunn, Ph.D., confirmed the diagnoses of panic disorder and generalized anxiety disorder (Exhibit 12F).  The record also documented a diagnosis of major depressive disorder (Exhibit 28F).

\*       \*       \*

Progress notes from Dr. Lilly Jacob indicated that the claimant was taking Campral, Cymbalta, and Abilify for symptoms of depression and anxiety.  On October 6, 2008, the claimant reported that she was happier and no longer had mood swings or anger problems.  Dr. Jacob reported that the claimant was sober.  No other problems were voiced (Exhibit 4F).

A psychiatric evaluation report from Dr. Nohl Braun, dated October 10, 2008, indicated that the claimant had very severe agoraphobia that caused automatic panic attacks when she left her house.  He noted that the claimant reported that she worried a lot and suffered from bipolar disorder.  He further reported that the claimant had an alcohol problem; however, was doing well since she went to "detox" in August of 2008.  On examination, Dr. Braun observed the claimant's mood was "pretty good."  He indicated that the claimant was anxious and tearful.  However, the rest of the examination was fairly normal.  Dr. Braun diagnosed bipolar disorder, panic attacks with severe agoraphobia, generalized anxiety disorder, and alcohol dependence in early total remission.  He also noted that the claimant's GAF was 60 (Exhibit 4F).

Progress notes from Dr. Braun showed that the claimant had no acute reactions or side effects to her medications.  On December 5, 2008, the claimant reported continued mood swings and some residual anxiety and depression. Thus, Dr. Braun adjusted her medications. On January 9, 2009, Dr. Braun noted that the claimant appeared cheerful and had no frank anxiety.  In fact, the claimant reported that her anxiety was under control (Exhibit 7F).

Pharmacological management records from Amanda Flesher, PA-C, dated February 5, 2009 through April 2, 2009, indicated that the claimant denied feelings of depression or anxiety.  In fact, the claimant reported that she had

been doing well and had been taking her medications as prescribed with no adverse side effects. The claimant's mental examinations were also found to be consistently normal (Exhibits 11F and 16F). On April 30, 2009, the claimant reported mood instability. Ms. Flesher adjusted the claimant's medications and added Lamictal to target symptoms of Bipolar disorder (Exhibit 16F).

On April 4, 2009, the claimant was evaluated by consultative examiner, Paul Dunn, Ph.D. Dr. Dunn reported that the claimant complained of panic attacks, depression, agoraphobia, and mood swings related to bipolar disorder. However, the claimant indicated that her panic attacks have been well controlled as long as she stays in her house. On examination, Dr. Dunn observed that the claimant's concentration, memory, and persistence were within normal limits. However, he diagnosed panic disorder and generalized anxiety disorder based upon the claimant's self-reported symptoms (Exhibit 12F).

Treatment notes from Dr. Amelia McPeak noted that the claimant was doing well with her medications, and was not depressed. In February 2010, the claimant complained of recent increased mood instability. However, Dr. McPeak indicated that the claimant's mood was good at the time of examination. She also reported that the claimant's alcohol abuse was in remission. Based on the claimant's complaints, Dr. McPeak diagnosed major depressive disorder and increased the claimant's Lamictal (Exhibit 28F).

In looking at all of the mental health records, the undersigned notes the effectiveness of the claimant's medication, and the fact that the record contains no evidence of psychiatric hospitalizations. The undersigned notes that the record indicates the claimant had a good response to treatment given the normal mental status examinations and her favorable response to adjustments in her medications. In fact, the record showed the claimant was stable on her medications with only occasional exacerbations. Accordingly, the evidence of record supports that the claimant's condition is not as severe as alleged.

Furthermore, the undersigned notes that the claimant has provided inconsistent information regarding her daily activities. At the hearing, the claimant testified that she does not go out of her home alone. However, her mother testified that the claimant drives herself to AA meetings one to three times a week. In fact, her mother indicated that the claimant had just driven to a meeting the week before the hearing. This too contradicts the claimant's testimony in that she testified she did not remember the last time she drove.

As to the side effects of medication, there were none established which would interfere with the jobs identified by the vocational expert.

(Tr. at 15, 20-22.)

Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. § 416.927(d) (2011). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency (5) specialization, and (6) various other factors. Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. § 416.927(d)(2).

Under § 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Section 416.927(d)(2) provides that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Section 416.927(d)(2)(I) states that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under § 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty).

Contrary to Claimant's assertions, the ALJ fully considered the opinions of Dr. Braun and gave appropriate weight to his opinions. (Pl.'s Br. at 2-4.) The ALJ even adopted Dr. Braun's diagnoses of bipolar disorder, panic attacks with agoraphobia, generalized anxiety disorder. (Tr. 15, 411). Claimant also takes issue with the ALJ's finding that Dr. Braun

34

noted that Claimant "appear[ed] cheerful." (Tr. at 20, 637.)   The undersigned finds that this observation was made by Dr. Braun on December 8, 2008, rather than on January 9, 2009, but that this trivial error is unimportant, especially in light of the fact that Dr. Braun did not offer a disability opinion.  It is further noted that Dr. Braun ceased treatment of Claimant on January 9, 2009 and "forward[ed]" Claimant's treatment "to the PA" Amanda Flesher on that date.  (Tr. at 636.)  Dr. Braun did not offer a disability opinion.  (Tr. at 409-11, 414-15, 636-37.)   Ms. Flesher is not an acceptable medical source under governing regulations.  20 C.F.R. § § 416.913(1), 927(a).

Regarding Claimant's criticism of the ALJ's statement - "the claimant indicated that her panic attacks have been well controlled as long as she stays in her house" - the undersigned finds that this was not a "finding" by the ALJ but rather a restatement of Claimant's statement to Dr. Dunn.  (Tr. at 20, 666; Pl. Br. at 4).

The undersigned proposes that the presiding District Judge **FIND** that the ALJ complied with 20 C.F.R. § 416.927 in assessing the medical opinion evidence and that the decision properly assessed Dr. Braun's opinions as well as the other medical opinion evidence.

Residual Functional Capacity (RFC)

Claimant next argues that the ALJ failed to comply with Social Security Rulings 96-8p and 85-15 in assessing Claimant's RFC.  Specifically, Claimant asserts:

> The Plaintiff's RFC is so limited that her ability to respond appropriately to supervision, coworkers, and usual work situations is minimal at best.  The ALJ limited the Plaintiff to "minimal contact with the general public, co-workers and supervisors [...] an very little decision making" (Transcript pg. 18).  Every job requires some form of decision making, and it is impossible for a future reviewed [sic, reviewer] to be sure what the ALJ meant by "very little decision making."  Indeed, the VE named jobs such as order caller, mail

clerk, and shelving clerk. All of these positions include decision making, even as simple as deciding which supplies are required and need to be ordered, deciding what pile to put the mail in, or determining onto which shelf to place an item - which are the essential job duties of the named jobs. The Plaintiff would be required to make such decisions constantly in order to perform those jobs. One wonders whether the decision making abilities required are more than "very little decision making."

Additionally, the ALJ stated that she awarded significant weight to the opinion of Dr. Kuzniar, who completed a mental assessment on April 7, 2009 (Transcript pg. 22). However, she did not explain why she chose to only accept the narrative section of the assessment but ignored the limitations on the first two pages of the assessment. Indeed, when asked about the limitations on the assessment, the VE testified that the Plaintiff would not be able to maintain substantial gainful employment (Transcript pg. 71).

The ALJ failed to comply with SSR 96-8p in assessing the claimant's RFC because the ALJ's RFC assessment is simply conclusory and does not contain enough rationale or reference to the supporting evidence.

(Pl.'s Br. at 4-6.)

The Commissioner responds that

To the extent Plaintiff challenges the ALJ's decision to accept Dr. Kuzniar's discussion of her residual functional capacity (RFC) in part III of his report - the narrative section (Tr. 670) - rather than addressing herself to part I of Dr. Kuzniar's report - the summary conclusions worksheet section (Tr. 668-69) - Plaintiff also errs. "'Section I is merely a worksheet to aid in deciding the presence and degree of functional limitations and the adequacy of documentation and does not constitute the RFC assessment.'" Smith v. Comm'r of Soc. Sec., 631 F.3d 632, 636 (3d Cir. 2010)(quoting Program Operations Manual Systems (POMS), DI 24510.606)(emphasis omitted)). It is the RFC assessment, contained in part III of the form, and not the worksheet that appears in part I of the form, that is the governing portion of the state agency psychologist's assessment under agency policy. Id. Accord, Norris v. Astrue, 2008 WL 4911794, at *16 (E.D.N.C. Nov. 14, 2008).

Nor did the ALJ commit an error under SSR 96-8p when he assessed Plaintiff's RFC. Plaintiff claims that the ALJ offered only a "conclusory" assessment (Pl.'s Br. at 6), but this is an inaccurate characterization of the ALJ's decision. The decision addressed the evidence in detail, provided specific reasons to support the conclusion that Plaintiff was less limited that she claimed, and built a clear logical bridge between the evidence and the RFC conclusions (Tr. 18-23). See, e.g., Mellon v. Astrue, 2009 WL 2777653

*13 (D.S.C. Aug. 31, 2009) ("[S]o long as the narrative opinion is sufficiently detailed and cogent on the ultimate issues for the reviewing court to follow the ALJ's logic and reasoning and supported by substantial evidence in the record," the ALJ's articulation is adequate). The ALJ performed a painstaking analysis here that, judged by any standards, was more than adequate.

Plaintiff also cites SSR 85-15 and suggests an error with the ALJ's findings concerning her abilities to perform basis work functions (Pl. Br. at 5). In this case, the ALJ utilized a vocational expert to address Plaintiff's non-exertional limitations. SSR 85-15 specifically explains that in "many cases, a decisionmaker will need to consult a vocational resource." Id., 1985 WL 56857, at *3. Accord, SSR 96-9p, 1996 WL 374185, at *9 ("When an individual has been found to have a limited ability in one or more of [the] basic work activities, it may be useful to consult a vocational resource"). Here, the ALJ did just that: she brought in a vocational expert to testify as to whether Plaintiff's age, vocational factors, and functional limitations - including limitations to simple routine, repetitive 1-3 step tasks; minimal contact with the general public, coworkers, and supervisors; and a low pressured work setting with constant job duties and very little decision-making - were consistent with jobs that existed in significant numbers in the national economy (Tr. 66-68). The vocational expert provided numerous job titles that comported with Plaintiff's profile and the limitations specified by the ALJ (Tr. 67-68), which offered fully appropriate support for the ALJ's findings. See, e.g., McCallister v. Astrue, 2008 WL 2858583, at *12 (S.D.W.Va. July 22, 2008) (Stanley, U.S.M.J.) (in calling a vocational expert where the claimant needed a sit/stand option that would erode the occupational base, the ALJ complied with the intent of SSR 96-9p and 83-12, which describe situations with limited occupational bases and state that it "'may be especially useful in these situations to consult a vocational resource in order to determine whether the individual is able to make an adjustment to other work'") (quoting SSR 96-9p).

(Def.'s Br. at 18-20.)

The Commissioner further argues in a footnote:

To the extent Plaintiff raises a question of whether the term "very little decision-making" was comprehensible, she articulates no viable basis to suggest it was not. She speculates that all jobs require some degree of decision-making (e.g., which pile into which an object should be placed), but this is not a helpful exercise. The vocational expert had no difficulty responding to the hypothetical (Tr. 66-68). In fact, a limitation to jobs involving little decision-making is not an uncommon limitation encountered by vocational experts in disability proceedings involving mental impairments.

See, e.g. Cox v. Astrue, 495 F.3d 614, 621 (8th Cir. 2007); Hedge v. Astrue, 2010 WL 2025782, at *3 (E.D. Va. April 20, 2010); Dawson-Rhoades v. Barnhart, 2008 WL 906107, at *4 (D. Del. March 27, 2008); McManus v. Barnhart, 2004 WL 2212026, at *2 (D.Del. Sept. 27, 2004).

(Def.'s Br. at 20.)

Regarding Claimant's residual functional capacity, the ALJ made extensive findings:

After careful consideration of the entire record, the undersigned finds that the claimant has the RFC to perform light work as defined in 20 C.F.R. 416.967(b) except she can never climb ladders, ropes, and scaffolds. She occasionally may stoop. She must avoid concentrated exposure to extreme heat and cold, vibrations, and fumes, odors, dusts, gases, and poor ventilation. She must also avoid all hazards such as moving machinery and unprotected heights. The claimant retains the capacity to carry at least one to three step routine repetitive instructions. If transported to a work setting, the claimant retains the capacity to manage minimal contact with the general public, coworkers, and supervisors. She can best work with things instead of people. She also retains the capacity to manage a low pressured work setting with constant job duties and very little decision making.

*       *       *

The claimant alleged an inability to work due to bipolar disorder, panic attacks, depression, and agoraphobia. She indicated that she had "bad" panic attacks when she is around people. She further noted that she cannot "leave" without someone with her due to panic attacks.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

The claimant testified that she last worked in 1992 or 1993. She indicated that she was a housewife for 15 years following that time. The claimant stated that she was in a motor vehicle accident (MVA) on December 17, 2009. She stated that she has constant pain on right side of neck due to MVA. She also noted that she gets knots on the side of her neck and shoulder. The claimant testified that she takes muscle relaxers to release the knots. The claimant further stated that she has pain in her lungs, which she attributes to a pulmonary embolism she had in 2007. The claimant testified that the pulmonary embolism destroyed the lower lobe of her right lung. The

claimant indicated that she takes Symbicort and an albuterol inhaler for her condition.  She denied any side effects from her inhalers.  The claimant testified that she takes Nexium everyday for abdominal pain.  She indicated that the medication helps.  She also testified that she has been on oxygen at night for her lungs since December.  The claimant indicated that every once in a while she needs oxygen during the day if her inhaler does not work.

Concerning mental health, the claimant testified that she gets "down and blue" and does not want to do anything.  The claimant indicated that she takes Lamictal, Abilify, and Cymbalta for her mental conditions.  She denied any side effects from her medication, and indicated that her medications help her "sometimes."  The claimant also noted that she goes to counseling once or twice a month.  The claimant testified that she gets panic attacks whenever she leaves the house.  However, she indicated that she finds that her parent's house and her sister's house are "safe zones."  Regarding activities of daily living, the claimant indicated that she does her own laundry and makes her bed.  She noted that she has her driver's license, but cannot remember the last time she drove.  The claimant denied any hobbies or pastimes.  She indicated that she has two children who she sees every two weeks.  She denied having any friends outside of the family.

The claimant testified that she could lift and carry about 20-25 pounds and walk about 400 yards before getting out of breath.  The claimant stated that she had no difficulty sitting, or using her arms or legs.  The claimant indicated that she had a history of alcohol abuse; however, she stated that the last time she used alcohol was on July 22, 2009.

The claimant's mother, Patricia Kupher, also testified at the hearing.  Ms. Kupher indicated that she lives with the claimant and sees her every day.  She noted that the claimant is very anxious and gets jittery when she leaves the house.  However, she testified that the claimant is okay when she feels safe.  Ms. Kupher indicated that the claimant has good days and bad days.  With regard to alcohol use, she testified that the claimant has been sober since July 2009.  She further testified that the claimant drives herself to AA meetings one to three times a week and has no problem going to her meetings.  In fact, she indicated that the claimant drove to a meeting last week.

The objective evidence does not support the extreme limitations alleged and reveals the claimant is not fully credible.  In reviewing the evidence, the undersigned notes several records that predate the alleged onset date.  The undersigned reviewed this evidence and gave it consideration.  These records showed that the claimant was diagnosed with major depression, recurrent, moderate, generalized anxiety disorder, and alcohol abuse (Exhibits 1F, 2F, and 3F).  According to the records, the claimant was prescribed Cymbalta and Klonopin for her conditions.  Progress notes from Worthington Center

Psychiatric noted that the claimant's moods were better with Cymbalta (Exhibit 1F). A discharge summary from Chestnut Ridge Hospital, dated August 22, 2008, indicated that the clamant underwent alcohol detoxification. The record further indicated the claimant's Global Assessment of Functioning (GAF) was 31-40 on admission and 60-65 on discharge (Exhibit 2F). A history of acute pulmonary emboli was also noted (Exhibit 26F).

\*       \*       \*

Pertaining to physical impairments, the record revealed that the claimant reported to the ER at CCMH on several occasions in 2008 and early 2009 with complaints of shortness of breath and pain in the right side of her chest. Mild respiratory distress was noted on examination. However, x-rays of the chest were consistently negative. As such, the claimant's symptoms were treated as COPD exacerbation. She was administered inhaler and pain medications (Exhibit 6F and 15F).

Pulmonary function studies conducted on February 16, 2009 revealed very mild COPD (Exhibit 9F). A CT scan of the abdomen, dated June 2, 2009, revealed mild bibasilar fibrosis suggesting chronic cigarette smoking, and atelectasis and scarring in both lower lobes (Exhibit 17F).

Records from December 17, 2009 indicated that the claimant sustained a cervical spine compression fracture as the result of a MVA. On examination, the claimant's range of motion in the neck was supple. The claimant was prescribed medication, and was discharged in stable condition (Exhibit 23F). A CT of the cervical spine, dated December 17, 2009, revealed avulsion fractures from the anterior superior cortex of the body of C5. X-rays of the left shoulder were normal (Exhibit 23F). X-rays of the cervical spine, dated December 29, 2009, revealed a small anterosuperior chip of the C5 body. There was also question of a fracture of the traverse process of the C7 vertebra (Exhibit 29F).

Progress notes from Coplin Clinic, dated March 1, 2010, indicated that the claimant was placed on CPAP and oxygen for her COPD and was "doing better." Neck pain and a fracture of the fifth cervical vertebra was also documented (Exhibit 27F).

Progress notes from PARS Neurological Associates, Inc., dated February 18, 2010, indicated that the claimant's cervical symptoms had improved. On examination, it was noted that the claimant had full range of motion in the cervical spine with a soft collar in place. He indicated that the claimant's x-rays appeared stable (Exhibit 29F).

In sum, the record documented a history of COPD and residual pain status post fracture to the cervical spine; however, the objective evidence is consistent with a finding that the claimant is not as limited as alleged. The undersigned finds that the claimant has not provided convincing details regarding factors which precipitate her physical symptoms, claimant that the symptoms are present 'constantly.' Moreover, the treatment records discussed above establish that the claimant's physical symptoms are improving with treatment and show no instability.

As to side effects of medication, there are none established which would interfere with the jobs identified below by the vocational expert.

As to activities of daily living, the claimant indicated that she cares for her children and pets. She noted that she prepares sandwiches, frozen meals, eggs, and canned soup. She also indicated that she cleans the house and does dishes. The claimant noted that she drives when she has to. She also indicated that she has no problems with personal care. The undersigned notes that these extensive activities of daily [living] are inconsistent with the claimant's allegations and indicate that she is not as limited as alleged.

Additionally, the undersigned notes that a review of claimant's work history shows that she worked only sporadically prior to the alleged disability onset date, which raises a question as to whether the claimant's continuing unemployment is actually due to medical impairments.

As for the opinion evidence, Joseph Kuzniar, Ed.D., completed a psychiatric review technique on April 7, 2009, and opined the claimant had moderate limitations in maintaining social functioning, activities of daily living, and maintaining concentration, persistence, or pace. He also indicated that claimant had one to two episodes of decompensation (Exhibit 14F). The same day, Dr. Kuzniar also completed a mental residual functional assessment and opined that the claimant retains the capacity to carry out at least one to three step routine repetitive instructions. He noted that if transported to a work setting, the claimant retains the capacity to manage minimal contact with the general public, coworkers, and supervisors. He indicated that she can work best with things instead of people. He further indicated that the claimant retains the capacity to manage a low-pressured work setting with constant job duties and very little decision making (Exhibit 13F). Philip Comer, Ph.D., reviewed the record and affirmed Dr. Kuzniar's opinion as it is consistent with the record as a whole.

Amanda Flesher, PA-C, completed a mental assessment of ability to do work-related activities on March 4, 2010. Ms. Flesher opined that the claimant was moderately impaired in her ability to relate to co-workers, deal with the public, use judgment, interact with supervisors, and maintain

attention/concentration. She found that the claimant had marked limitations in dealing with work stress. Ms. Flesher indicated that the claimant was moderately impaired in her ability to understand, remember, and carry out detailed, but not complex instructions; and had marked limitations in understanding, remembering and carrying out complex job instructions. Additionally, she found the claimant was moderately impaired in her ability to related predictably in social situations and had marked limitations in her ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Ms. Flesher opined that due to anxiety and mood instability, the claimant's ability to complete normal work activities would be impaired. She further indicated that the claimant's mood instability and anxiety affect interpersonal and social interactions (Exhibit 30F). The undersigned gives no weight to Ms. Flesher's opinion as it is based on the claimant's self-reported severe complaints, and is inconsistent with medical records from Westbrook Health Services contained in Exhibits 4F, 7F, 11F, 16F, and 28F. Further, the finding of disability is an issue reserved for the Commissioner (SSR 96-5p).

Dr. Fulvio Franyutti completed a physical residual functional capacity assessment on February 26, 2009, and opined the claimant could occasionally lift/carry fifty pounds, and frequently lift/carry twenty-five pounds. He found the claimant could stand/walk for six hours in an eight-hour workday, and sit for six hours in an eight-hour workday. He found no postural, manipulative, visual or communicative limitations. However, he found that the claimant must avoid concentrated exposure to extreme cold, extreme heat, vibration, fumes, odors, dusts, gases, poor ventilation, hazards such as machinery and heights (Exhibit 10F). The undersigned gives significant weight to Dr. Franyutti's opinion as it is consistent with the record as a whole. However, the undersigned notes that the claimant's exertional limitations were reduced to light afer her MVA in December 2009.

Dr. Atiya Lateef completed a physical residual functional capacity assessment on June 18, 2009, and opined the claimant would occasionally lift/carry fifty pounds, and frequently lift/carry twenty-five pounds. She found the claimant could stand/walk for six hours in an eight-hour workday, and sit for six hours in an eight-hour workday. She indicated that the claimant can never climb ladders, ropes, and scaffolds; and occasionally may stoop. She further indicated that the claimant must avoid concentrated exposure to extreme cold, extreme heat, vibration, and fumes, odors, dusts, gases, and poor ventilation; and all exposure to hazards such as machinery and heights (Exhibit 19F). The undersigned gives significant weight to Dr. Lateef's opinion as it is consistent with the claimant's residual functional capacity and the record as a whole. However, the undersigned notes that the claimant's exertional limitations were reduced to light after her MVA in December

2009.

In sum, the claimant's residual functional capacity as determined in this decision is fully supported when considering the claimant's testimony and written statements in conjunction with the clinical facts, medical findings and opinions of the treating, examining and non-examining physicians.

(Tr. at 18-20, 22-23.)

At steps four and five of the sequential analysis, the ALJ must determine the claimant's residual functional capacity (RFC) for substantial gainful activity. "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. § 416.945(a) (2011). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

The RFC determination is an issue reserved to the Commissioner. See 20 C.F.R. § 416.927(e)(2) (2011).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

Regarding Claimant's assertion that the ALJ erred under SSR 96-8p because "the ALJ's RFC assessment is simply conclusory and does not contain any rationale or reference to the supporting evidence," clearly this is a mischaracterization of the ALJ's very thorough and thoughtful decision. (Pl.'s Br. at 4-5). As detailed above, the ALJ provided specific reasons to support her conclusion that Claimant was less limited that she claimed. (Tr. 18-23).

Claimant also cites SSR 85-15 and suggests an error with the ALJ's findings concerning Claimant's abilities to perform basic work functions. (Pl. Br. at 5.) Here the ALJ properly asked a vocational expert to address Claimant's non-exertional limitations, which question is specifically authorized under the regulation. Vocational expert Patricia Posey testified as to whether Claimant's age, vocational factors, and functional limitations - including limitations to simple routine, repetitive 1-3 step tasks; minimal contact with the general public, coworkers, and supervisors; and a low pressured work setting with constant job duties and very little decision-making - were consistent with jobs that existed in significant numbers in the national economy. (Tr. 66-68.) Ms. Posey provided several job titles that comported with Claimant's profile and the limitations specified by the ALJ. (Tr. 66-68.)

Claimant also questions the ALJ's use of the phrase "very little decision-making." (Pl. Br. at 5-6.) Claimant states that "[e]very job requires some form of decision making, and it is impossible for a future reviewer to be sure what the ALJ meant." (Pl. Br. at 5.) The undersigned finds that the VE had no difficulty responding to the hypothetical containing this phrase. (Tr. 66-68). As pointed out by the Commissioner, "a limitation to jobs

44

involving little decision-making is not an uncommon limitation encountered by vocational experts in disability proceedings involving mental impairments." (Def. Br. at 20.)

Regarding Claimant's assertion that the ALJ improperly accepted Dr. Kuzniar's discussion of Claimant's RFC in the narrative "Part III - Functional Capacity Assessment" section (Tr. 670) - rather than addressing the first part of Dr. Kuzniar's report - the "Part I - Summary Conclusions" worksheet section (Tr. 668-69), the undersigned finds that the ALJ properly analyzed Dr. Kuzniar's assessment. (Pl.'s Br. at 6.) As pointed out by the Commissioner, the RFC narrative is the governing portion of the assessment, not the worksheet form.

Thus, the undersigned proposes that the presiding District Judge **FIND** that the ALJ properly assessed Claimant's RFC.

It is further proposed that the presiding District Judge **FIND** that the Commissioner's decision denying benefits is supported by substantial evidence.

For the reasons set forth above, it is hereby respectfully **RECOMMENDED** that the presiding District Judge **AFFIRM** the final decision of the Commissioner and **DISMISS** this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation

to which objection is made, and the basis of such objection.  Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of <u>de novo</u> review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  <u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1366 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985); <u>Wright v. Collins</u>, 766 F.2d 841, 846 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, Judge Johnston, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.


  January 30, 2013    
    Date

Mary E. Stanley
United States Magistrate Judge